UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

STARR INTERNATIONAL U.S.A.
INVESTMENTS LC and C.V. STARR &
CO., INC. TRUST

        Plaintiffs,

        v.

ERNST & YOUNG, LLP

        Defendant.

------------------------------------------------------x

**11 CIV 3745**

**COMPLAINT**

No. _____

**JURY TRIAL DEMANDED**

*ECF CASE*

RECEIVED
JUN 02 2011
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiffs Starr International U.S.A. Investments LC ("Starr International") and C.V. Starr & Co., Inc. Trust ("CVS Trust") (collectively, "Plaintiffs"), as and for their complaint against defendant Ernst & Young, LLP ("E&Y" or "Defendant"), allege as follows[1]:

**I.**   **PARTIES**

      **A.**   **Plaintiffs**

      1.    Plaintiff Starr International is a limited company organized under the laws of the State of Florida with its principal place of business at 399 Park Avenue, New York, New York 10022.

      2.    Plaintiff CVS Trust is a trust formed under the laws of the State of New York with its situs at 399 Park Avenue, New York, New York 10022.

---

[1]    Plaintiffs' allegations are based upon personal knowledge as to their actions and upon counsel's investigation as to all other matters.  Counsel's investigation included review of, among others things, press releases, conference call transcripts, documents and testimony provided to Congress, filings with the Securities and Exchange Commission, various complaints filed in *In re Lehman Brothers Holdings, Inc.*, No. 09-MD-2017 (S.D.N.Y.), as well as the March 11, 2010 report and documents collected by the Bankruptcy Court-appointed examiner Anton R. Valukas.

**B.**     **Defendant**

3.      E&Y is a limited liability partnership and public accounting firm with offices worldwide, including one located at Five Times Square, New York, New York 10036.

4.      Defendant E&Y served as non-party Lehman Brothers Holdings, Inc.'s ("Lehman" or the "Company") purportedly independent auditor at all times relevant to the allegations in this Complaint.  Until September 15, 2008, Lehman was a global investment bank whose common stock was traded on the New York Stock Exchange.  On September 15, 2008, Lehman filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. Among other things, E&Y audited Lehman's fiscal 2007 financial statements and certified that those financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and falsely represented that it conducted its audits or reviews in accordance with Generally Accepted Auditing Standards ("GAAS"), as set forth by the Public Company Accounting Oversight Board ("PCAOB").  E&Y also reviewed Lehman's interim financial statements during the relevant time period and represented that no material modifications were needed to be made for them to conform with GAAP.

**II.     JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1391(b) and (c).

**III.    PLAINTIFFS' PURCHASES**

**A.**     **The Purchases**

7.      Plaintiffs purchased over $200 million of Lehman securities pursuant to Lehman's shelf registration statement dated May 30, 2006 as filed on form S-3 ("Shelf Registration

Statement") and a prospectus supplement, dated June 9, 2008 ("June 9 Prospectus"), to Lehman's May 30, 2006 prospectus ("2006 Prospectus") (collectively, the "Offering Materials") as well as the documents incorporated by reference in those Offering Materials, including Lehman's financial statements as audited by E&Y.  The Offering Materials and specifically the June 9 Prospectus also incorporated the quarterly report of Lehman's First Quarter 2008 Form 10-Q and a series of current SEC Reports on Form 8-K dated between December 3, 2007 and June 9, 2008.

8.    Lehman executives solicited Plaintiffs to participate directly in offerings of common stock at $28 per share as well as preferred shares, Series Q, consisting of 2 million shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, issued at $1,000 per share (collectively, the "Offerings").  The total common stock offering was $4 billion.  The total preferred share offering was $2 billion with $60 million paid to Lehman's broker/dealer subsidiary, Lehman Brothers, Inc. ("LBI"), as an underwriting discount.  Both types of shares were offered pursuant to the Offering Materials and specifically the June 9 Prospectus and were delivered by LBI on June 12, 2008.

9.    The Offerings were announced by Lehman in an 8-K, dated June 12, 2008, which E&Y, as Lehman's auditor, reviewed.

10.    As a result of these solicitations and in reliance upon the Offering Materials and other Lehman public filings, on June 12, 2008, Starr International purchased $75,000,000 in Lehman Preferred Shares, Series Q under CUSIP 52520W218.

11.    As a result of these solicitations and in reliance upon the Offering Materials and other Lehman public filings, on June 12, 2008, CVS Trust purchased $25,000,000 in Lehman Preferred Shares, Series Q under CUSIP 52520W218.

12.     As a result of these solicitations and in reliance upon the Offering Materials and other Lehman public filings, on June 12, 2008, Starr International purchased $75,600,000 of Lehman common stock under CUSIP 524908100.

13.     As a result of these solicitations and in reliance upon the Offering Materials and other Lehman public filings, on June 12, 2008, CVS Trust purchased $25,200,000 of Lehman common stock under CUSIP 524908100.

**B.      E&Y's Relationship with Lehman and to Plaintiffs' Purchases**

14.     E&Y served as Lehman's outside auditor for decades, and was retained by Lehman to conduct quarterly reviews of its interim financial results and to conduct the annual audit of Lehman's fiscal results for the fiscal years ending in 2005, 2006 and 2007, among others.  In its position as Lehman's outside auditor, E&Y was responsible for conducting audits on Lehman's financial statements and issuing audit reports, knowing that they would be used and relied upon by prospective and existing investors of Lehman like Plaintiffs, as well as analysts, in evaluating the purchase and holding of Lehman securities.

15.     By virtue of its long history with Lehman, E&Y was intimately involved with Lehman's business model and its employees.

16.     In addition, E&Y, as part of its standard procedures with public companies it audits, would have reviewed Lehman's quarterly press releases, which announced Lehman's performance, financial condition, asset valuations and revenues.  E&Y reviewed drafts of Lehman's filings with the SEC prior to filing, and also attended and made presentations at Board and Audit Committee meetings, where E&Y discussed the results of its examination of Lehman's financial statements.  For its services, E&Y received significant compensation from Lehman.

17. For the fiscal year 2007, E&Y provided unqualified and "clean" audit opinions included in Lehman's 10-K for 2007, the final annual report issued prior to Plaintiffs' securities purchases, confirming that E&Y had conducted its audit in accordance with GAAS and that based on its audit, Lehman's financial statements fairly represented the Company's position for the fiscal year 2007, in accordance with GAAP.

## IV. THE OFFERING MATERIALS WERE MATERIALLY FALSE AND MISLEADING – THE REPO 105 TRANSACTIONS.

### A. Context of the Repo 105 Transactions – The Importance of Leverage

18. During the time leading up to Plaintiffs' purchases, Lehman consistently described the importance of its net leverage ratio to its business as follows: "The relationship of assets to equity is one measure of a company's capital adequacy. Generally, this leverage ratio is computed by dividing assets by stockholders' equity. We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital." *See, e.g.*, 2007 10-K at 63.

19. In calculating the numerator for its net leverage ratio, Lehman defined "net assets" in its 2007 10-K as total assets less: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. For the denominator, Lehman included stockholders' equity and junior subordinated notes in "tangible equity capital," but excluded identifiable intangible assets and goodwill. Lehman's publicly reported net leverage ratio, therefore, supposedly compared the Company's riskiest assets to its available stockholders' equity to absorb losses sustained by such assets.

20. In fact, net leverage was so meaningful that E&Y's audit workpapers stated that "Materiality is usually defined as any item individually, or in the aggregate, that moves net

leverage by 0.1 or more (typically $1.8 billion)." According to E&Y's engagement partner, William Schlich, this was Lehman's own definition for materiality with respect to net leverage. Accordingly, a "one-tenth" of a point adjustment in net leverage, which during the relevant time period meant either an increase or decrease in net assets or tangible equity capital of $1.8 billion, was material to Lehman.

### B.      The Repo 105 Transactions.

21.      Just days before the end of each fiscal quarter during the relevant time period and unbeknownst to Plaintiffs, Lehman entered into tens of billions of dollars worth of undisclosed repurchase and resale transactions known as "Repo 105" or "Repo 108" transactions (together "Repo 105"). Lehman recorded these transactions on its books as though the asset collateralizing the loan had actually been *sold* and removed from its balance sheet. Lehman would then use the cash received from the Repo 105 loan to pay down other existing liabilities, which had the effect of *reducing* Lehman's net leverage ratio, because it reduced the numerator in the net leverage ratio (net assets) (through the "sale" of the collateralizing asset and the use of cash to pay down other short-term debt), while having no impact on the denominator in the net leverage ratio (tangible equity ratio).

22.      These transactions were far different from routine repo transactions. Specifically, Lehman, along with the majority of investment banking firms on Wall Street, routinely entered into ordinary sale and repurchase agreements to satisfy short-term cash needs, borrowing cash from counterparties at fixed interest rates and putting up collateral, typically in the form of financial instruments, to secure financing (referred to herein as "Ordinary Repo" transactions). Upon maturity of the Ordinary Repo transactions, Lehman would repay the cash to the counterparty, plus interest, and reclaim its collateral, ending the arrangement.

23.     Lehman accounted for Ordinary Repos as financings – *i.e.*, debt – recording both an asset (the cash proceeds of the Ordinary Repo loan) and a liability (an obligation to repay the Ordinary Repo loan).  Significantly, the collateral that securitized the Ordinary Repo remained on Lehman's balance sheet, and the incoming cash and corresponding liability had the effect of *increasing* Lehman's net leverage ratio as the numerator (net assets) increased, while the denominator (tangible equity capital) remained the same.

24.     Unlike routine repos, the Repo 105 Transactions *reduced* Lehman's all important net leverage ratio, as noted above, and was a more expensive form of short-term financing than an Ordinary Repo.  Lehman had the ability to conduct an Ordinary Repo transaction using the same securities and with substantially the same counterparties, at a lower cost, but instead engaged in Repo 105 transactions that had the effect of temporarily "removing" tens of billions of dollars of assets off Lehman's balance sheet at the end of each quarter.

25.     As a result, the apparent reduction in the net leverage ratio was only temporary, solely for the purpose of public reporting, and wholly illusory.  Pursuant to the terms of these Repo 105 transactions, just days after the Company's quarter ended, Lehman would repay the Repo 105 counterparty, and the collateralized assets would return to Lehman's balance sheet, thereby immediately increasing the net leverage ratio by highly material amounts shortly after the quarter had closed.

C.     **The False and Misleading Financial Statements.**

26.     Lehman's financial statements, as audited by E&Y, for fiscal year 2007, as well as its quarterly financial statements from the second quarter of 2007 through its bankruptcy filing, violated GAAP and Securities and Exchange Commission ("SEC") disclosure requirements.  Lehman represented in its public filings that all transactions containing short-term repurchase commitments were recorded as "secured financing transactions," which effectively

had no net impact on Lehman's balance sheet. In truth, however, Lehman accounted for its Repo 105 transactions as "sales" under FAS 140, which had a profound impact on Lehman's balance sheet, most notably its all important net leverage ratio.

27.     This reporting was contrary to FAS 140. Specifically, guidance in FAS 140 itself states that categorizing any repurchase agreement as a sale is unusual. To qualify as a sale under FAS 140, the company transferring the asset must divest itself of the asset and relinquish all control over the assets. The retention of any portion of control over the assets precludes treatment of a transfer of financial assets as a "sale." Only when the transferor has divested itself of the assets from a control perspective — such that the asset is effectively "isolated from the transferor and put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership," and "the transferor does not maintain effective control over the transferred assets through" for example "an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity" — can the transaction be deemed a "sale."

28.     Further, FAS 140 specifically notes that the determination of whether a transfer of assets qualifies as a sale might depend upon a legal determination of whether such arrangement represents a "true sale at law." Lehman, however, was unable to obtain a true sale opinion from any United States law firm. Lehman did not disclose its inability to obtain such an opinion or its decision to nevertheless treat its Repo 105 transactions as sales. Rather, Lehman attempted to satisfy the requirements of FAS 140 through an opinion from Linklaters, a law firm in the United Kingdom within the context of English Law and then channel Repo 105 transactions through a Lehman subsidiary in the United Kingdom. This attempt to avoid FAS 140 was futile: because no U.S. firm would provide the opinion under U.S. law, there was no basis in FAS 140 for

recording the transactions as sales, nor was there a legitimate business purpose or economic substance behind channeling the Repo 105 transactions through the United Kingdom.

29.     Lehman's accounting for its Repo 105 transactions also failed fundamental tenets of financial reporting under GAAP.  GAAP requires that the overall impression created by financial statements be consistent with the business realities of the company's financial position and operations, such that the financial statements are *useful* and comprehensible to users in making rational business and investment decisions.  *See, e.g.*, FASCON 1, ¶¶ 9, 16, 33-34; FASCON 5, ¶ 5.  FASCON 1 states that "Financial reporting should include explanations and interpretations to help users understand financial information."  FASCON 1, ¶ 54.  Under GAAP, "*nothing material is left out of the information* that may be necessary to [ensure] that [the report] validly represents the underlying events and conditions."  FASCON 2, ¶¶ 79-80 (emphasis added).  FASCON 5 explains that footnotes are an integral part of financial statements and are read in conjunction with the notes to the financial statements.  Here, Lehman's accounting treatment for its Repo 105 transactions, and the total absence of any disclosures about Repo 105 in footnotes, the MD&A section of the SEC filings or elsewhere created a false impression of Lehman's business condition, violating GAAP.

30.     In addition, GAAP requires that financial statements place substance over form. FASCON 2, for example, states in relevant part:

> . . . The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form . . . . (FASCON 2, ¶ 59)

31.     Additionally, AU § 411 states, in relevant part:

> Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance.  (AU § 411.06)

32.     Lehman's Repo 105 transactions were not "sales" for a number of reasons. Among others, they lacked the necessary, legitimate business purpose and economic substance to be recorded as legitimate sales under GAAP.

33.     Moreover, unlike an actual sale, Lehman's repurchase agreements *required* Lehman to repurchase the collateral within days after the close of the reporting period; they did not merely grant Lehman the right to do so.  Consequently, in his prepared testimony before Congress, the examiner appointed by the U.S. Bankruptcy Court for the Southern District of New York, Anton K. Valukas (the "Examiner"), explained that Lehman's public disclosures were misleading by its failure to disclose its use of Repo 105 transactions: Lehman did not disclose that it had only temporarily reduced its net leverage ratio through Repo 105 transactions, "[c]onsequently, Lehman's statement that the net leverage ratio was a 'more meaningful' measurement of leverage was rendered misleading because that ratio – as reported by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated Lehman's leverage significantly."

34.     Lehman also issued materially false and misleading explanations in the Management's Discussion and Analysis ("MD&A") section of its periodic reports relating to the rationale behind the reported decreases to its net leverage ratio (either quarter-on-quarter or comparing to the prior year's same quarter to the reported quarter), as they falsely and misleadingly failed to disclose that Lehman was contractually obligated to repurchase the Repo 105 assets.

35.     In addition, Lehman's public statements regarding its liquidity (the immediate ability to access funds to pay down short-term obligations) being "essential" to its business was rendered materially misleading because its financial statements and related footnote disclosures

failed to disclose Lehman's immediate obligation to repay tens of billions of dollars in Repo 105 transactions just days after the end of each fiscal quarter. Thus, Lehman's reported short-term or current liabilities were similarly understated by a material amount. As a result, Lehman did not have nearly as much in available liquidity or in its liquidity pool as it represented.

36.     An analyst or a member of the investing public reading Lehman's SEC filings from cover to cover, with unlimited time, would not have learned about the Repo 105 program, Lehman's true net leverage, or Lehman's true liquidity pool. To the contrary, Lehman affirmatively told readers that its repurchase agreements were treated as financial arrangements, not sales, under FAS 140.

### D.     The Financial Statements & Public Filings Which Were Impacted.

37.     The following false and misleading statements regarding Repo 105 transactions appear in the Forms 10-Q and 10-K filed by Lehman during the relevant period:

38.     **2Q07:** On July 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended May 31, 2007 ("2Q07 10-Q") (which largely repeated information in its June 12, 2007 Form 8-K).

39.     The 2Q07 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially false and misleading because it failed to take into account $31.943 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements. Had the assets that were subject to the Repo 105 transactions been included, Lehman's net leverage ratio would have been 16.9, representing an increase 15 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

40.     In addition, the 2Q07 10-Q reported $137.948 billion in securities sold under agreements to repurchase. This statement was materially false and misleading because it

excluded almost $32 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

41.    **3Q07**: On October 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended August 31, 2007 ("3Q07 10-Q") (which largely repeated information in its September 18, 2007 Form 8-K).

42.    The 3Q07 10-Q reported that Lehman's net leverage ratio was 16.1, which was materially misleading because it failed to take into account $36.407 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.    Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.8, representing an increase 17 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

43.    In addition, the 3Q07 10-Q reported $169.302 billion in securities sold under agreements to repurchase.    This statement was materially false and misleading because it excluded over $36 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

44.    **FY2007**: On January 29, 2008, Lehman filed with the SEC its annual report on Form 10-K for the fiscal year ended November 30, 2007 ("2007 10-K") (which largely repeated information in its December 13, 2007 Form 8-K) and is incorporated by reference into the Offering Materials.

45.    The 2007 10-K reported that Lehman's net leverage ratio was 16.1, which was materially misleading because it failed to take into account $38.634 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.    Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.8, representing an

increase 17 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

46.     In addition, the 2007 10-K reported $181.732 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it excluded almost $39 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

47.     **1Q08:**  On April 8, 2008, Lehman filed with the SEC its quarterly report on Form 10-Q for the first quarter ended February 29, 2008 ("1Q08 10-Q") (which largely repeated information in its March 18, 2008 Form 8-K) and is incorporated by reference into the Offering Materials.

48.     The 1Q08 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially misleading because it failed to take into account $49.102 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements.  Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.3, representing an increase 19 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.

49.     The 1Q08 10-Q contained a review opinion on the Company's interim financial statements.  Defendant E&Y noted that it had conducted a review of the consolidated financial statements for the quarter and stated **"we are not aware of any material modifications that should be made."**  (Emphasis added).

50.     In addition, the 1Q08 10-Q reported $197.128 billion in securities sold under agreements to repurchase.  This statement was materially false and misleading because it

excluded over $49 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

51.    **2Q08:** On June 9, 2008, Lehman issued a press release, filed with the SEC on Form 8-K, pre-announcing its financial results for the second quarter ended May 31, 2008 ("6/9/08 8-K").

52.    The 6/9/08 8-K claimed that Lehman had reduced its net leverage ratio to below 12.5. This statement was materially misleading because the 6/9/08 8-K failed to take into account $50.383 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements. The 6/9/08 8-K was incorporated by reference into the Offering Materials.

53.    The 6/9/08 8-K also stated that the Company "further strengthened its liquidity and capital position" by growing its "liquidity pool to an estimated $45 billion" and decreasing gross assets and net assets by approximately $130 billion and $60 billion, respectively.

54.    On June 16, 2008, the Company issued another press release, filed with the SEC on Form 8-K, announcing its results for the second quarter of 2008 ("6/16/08 8-K").

55.    The 6/16/08 8-K reported a net leverage ratio of 12.0, and also announced that the firm reduced its gross assets and net assets by $147 billion and $70 billion, respectively, during the second quarter. These statements were materially misleading because the 6/16/08 8-K failed to disclose $50.383 billion in Repo 105 assets that had been removed only temporarily from Lehman's balance sheet at quarter end. Had the assets been included, Lehman's net leverage ratio would have been 13.9, representing an increase of 18 times Lehman's own materiality threshold of a change in net leverage of 0.1.

56.    This quarterly cycle of temporarily "removing" as much as $50 billion of assets off its balance sheet for only days at quarter-end created the false impression that Lehman had

reduced its balance sheet exposure and net leverage, and fostered the appearance of increased liquidity, and thereby made Lehman's financial health appear significantly more sound than it actually was.  The failure to disclose the tens of billions of dollars in Repo 105 transactions consistently rendered statements in Lehman's quarterly and annual filings throughout the relevant period materially false and misleading as follows:

a. Each Form 10-Q and Lehman's 2007 10-K represented that securities sold under agreements to repurchase, are "treated as collateralized agreements and financings for financial reporting purposes."  This statement was untrue and materially misleading because it failed to disclose that, through Lehman's Repo 105 program, tens of billions of dollars in securities sold each quarter pursuant to agreements to repurchase were not treated as "financings for financial reporting purposes" but were treated as sales by Lehman;

b. Each Form 10-Q and the 2007 10-K purported to describe all of Lehman's material off-balance sheet arrangements.  In fact, each filing expressly included a discussion and table purportedly summarizing all "Off-Balance Sheet Arrangements" in the MD&A section.  Such descriptions were materially false and misleading because they failed to list or discuss the material fact that Lehman had agreed to tens of billions of dollars in off-balance sheet commitments that were not included in these descriptions;

c. Each Form 10-Q contained a statement that the "Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles," and included certifications from certain former Lehman executive officers stating that "this report does not contain any untrue statements of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flow of the registrant." These statements were materially false and misleading for, among other reasons described herein, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities, and violated GAAP.

d. Each Form 10-Q contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y (the "Interim Reports"), stating that, based on its review of Lehman's consolidated financial statements and in accordance with the standards of the PCAOB, "we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles." This statement was materially false for, among other reasons described herein, failing to disclose the

Repo 105 transactions, which falsely reduced net leverage and understated liabilities, and violated GAAP.

e. The 2007 10-K represented that Lehman's "Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles," and included certifications from certain former Lehman executive officers stating that "this report does not contain any untrue statements of a material fact or omit to state a material fact" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant." These statements were false and misleading for, among other reasons described herein, failing to disclose the Repo 105 transactions, which falsely reduced net leverage and understated liabilities, and violated GAAP.

f. The 2007 10-K included E&Y's "Report of Independent Registered Public Accounting Firm," signed January 28, 2008, certifying that: (1) Lehman's FY07 financial results: (a) were prepared in accordance with GAAP; and (b) in all material respects, fairly presented the financial condition and operations of Lehman as of November 30, 2007; and (2) E&Y conducted its audit of Lehman's FY07 financial results in accordance with GAAS (the "2007 Audit Report"). E&Y consented to the inclusion of its 2007 Audit Report in Lehman's 2007 Form 10-K, and consented to the incorporation of the 2007 Audit Report by reference in registration statements, including Lehman's May 30, 2006 S-3 Shelf Registration Statement (No. 333 134553), and post effective amendments. These statements in E&Y's 2007 Audit Report were false and misleading because, contrary to E&Y's representation, Lehman's FY07 financial results were not prepared in accordance with GAAP because the Company's net leverage was understated through the use of Repo 105 transactions, and E&Y's audit of Lehman's FY07 financial results was not performed in accordance with GAAS.

## E.   **Impact on the Offering Materials**

57.   The Offering Materials explicitly incorporated by reference the 2007 10-K, 1Q08 10-Q, 6/9/08 10-K, as well as the consolidated financial statements and financial statement schedule of Lehman that appeared in the 2007 10-K which were both audited by E&Y. The failure to disclose Lehman's use and accounting treatment of Repo 105 transactions in its financial statements and related footnotes incorporated into the Offering Materials violated numerous GAAP provisions and SEC regulations. This material omission caused Lehman's

financial reports to present an unrealistic and unreliable picture of the Company's business realities by misrepresenting its net leverage and liquidity, in violation of, among others, Accounting Release 173 ("[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations") and FASCON 1 (specifically ¶¶ 32, 34 & 42) and FASCON 2 (specifically ¶¶ 15, 33, Figure 1, ¶¶ 58, 79-80, 91-97, 160).

58.     Moreover, the SEC requires that certain information be disclosed in the MD&A section of periodic reports.  Specifically, Item 303 of SEC Regulation S-K states that the registrant's MD&A section of its SEC filings should provide users of financial statements with relevant information in assessing the registrant's financial condition and results of operations, including trends and uncertainties that would cause reported financial information to not be indicative of its future financial condition or future operating results.  By omitting any mention of Repo 105 transactions, the Offering Materials violated Item 303's disclosure requirements. Nowhere did the Offering Materials report, among others, the material effect Repo 105 transactions had on the Company's balance sheet, net leverage, liquidity and capital resources, and their nature or business purpose.

## COUNT I

### Violations Of Section 11 Of The Securities Act Against E&Y

59.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows. This Count is based on strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

60.     This Count is asserted for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, as Plaintiffs' securities purchases are pursuant or traceable to the materially false and misleading Offering Materials, including but not limited to the Shelf Registration Statement, June 9 Prospectus and other materials incorporated by reference in the Shelf Registration Statement.

61.     Plaintiffs purchased or otherwise acquired Lehman securities in or traceable to the Offering Materials issued in connection with Lehman's offering of common stock and Series Q Preferred Shares on June 9, 2008 – the date of the offering. The date of the offering – and not the prior date of the Shelf Registration Statement – was the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

62.     On May 30, 2006, Lehman filed the Shelf Registration Statement with the SEC, as referred to above, which allowed Lehman to make issuances when it desired. The Shelf Registration Statement incorporated Lehman's Annual Report on Form 10-K for the fiscal year ended November 30, 2005 filed with the SEC and stated:

> [M]anagement's assessment of the effectiveness of internal control over financial reporting as of November 30, 2005 included therein, have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their reports thereon, included therein, and

incorporated by reference therein.  Such consolidated financial statements and management's assessment are, and audited consolidated financial statements and management's assessment of internal control over financial reporting to be included in subsequently filed documents will be incorporated herein in reliance upon the reports of Ernst & Young LLP pertaining to such consolidated financial statements and management's assessments to the extent covered by consents filed with the Securities and Exchange Commission, given on the authority of such firm as experts in accounting and auditing.

63.    Each offering under the Shelf Registration Statement allowed the supplemental prospectus issued to incorporate more recent filings of Lehman with the SEC.

64.    Lehman's June 9 Offerings were conducted pursuant to the Shelf Registration Statement, 2006 Prospectus and the June 2009 Prospectus.  The 2006 Prospectus stated that it was part of the Shelf Registration Statement.  The June 2009 Prospectus also stated that it was part of the Shelf Registration Statement.  Further, the 2006 Prospectus expressly incorporated by reference Lehman's Forms 10-K, 10-Q and 8-K that were filed with the SEC subsequent to the 2006 Prospectus and prior to the date of each Offering conducted pursuant to the 2006 Prospectus.

65.    The Shelf Registration Statement, 2006 Prospectus and the June 2009 Prospectus incorporated Lehman's audited financial statements by reference, as required by E&Y.

66.    The Shelf Registration Statement, the June 9 Prospectus (*i.e.*, the Prospectus Supplement offering the common stock and Series Q Preferred Shares to, among others, the Plaintiffs) and other offering materials incorporated by reference therein at the time of the Offerings, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.

67.    Plaintiffs' purchases were made pursuant to these Offering Materials which contained untrue statements and material omissions including those that were incorporated in the Shelf Registration Statement, 2006 Prospectus, and June 9 Prospectus.

68.   E&Y's audit report, included in Lehman's 2007 10-K and incorporated by reference into the Offering Materials, falsely certified that Lehman's financial statements were prepared in accordance with GAAP and falsely represented that it conducted its audits or reviews in accordance with GAAS.  In addition, E&Y's certifications of Lehman's quarterly financials, included within the Offering Materials, falsely stated that no material modifications of Lehman's financial statements were required for those statements to comply with GAAP, and that E&Y complied with GAAS in conducting its quarterly reviews.

69.   Plaintiffs did not know of the conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

70.   None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, each concerned existing facts.  Moreover, E&Y did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

71.   Plaintiffs have sustained damages.  The value of Plaintiffs' securities purchased pursuant or traceable to the Offerings has declined substantially due to E&Y's violations of Section 11 of the Securities Act.

72.   By reason of the foregoing, E&Y is liable for violations of Section 11 of the Securities Act to Plaintiffs.

### COUNT II

### Professional Negligence Against E&Y

73.   Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further allege as follows.  This Count is based on negligence and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically

excluded from this Count.

74.    E&Y, as Lehman's independent auditor, owed a duty to Plaintiffs as a public investor in Lehman to perform its audits in a professional manner and in accordance with GAAP and GAAS.

75.    E&Y, in the course of its audits of Lehman, supplied false information for the guidance of public investors in the above mentioned limited offerings to institutional investors because E&Y failed to exercise reasonable care or competence in conducting its audits.

76.    Given the size of the Offerings, and given E&Y's close relationship with Lehman, E&Y must have known that the group of institutional investors, including Plaintiffs, in the June 9 Offering intended to rely on Lehman's audited financials in order to determine whether they would invest in Lehman through the Shelf Registration Offerings described above.

77.    Based upon its annual audit and quarterly reviews, E&Y knew about the Repo 105 transactions but allowed Lehman to improperly account for and inadequately disclose them.

78.    As a result, E&Y allowed Lehman to materially misstate its true net leverage ratio as reported to investors, thereby giving a false impression of its true liquidity position. Lehman's true financial condition contradicted the unqualified audit report and interim reviews on Lehman's financial statements, which report and reviews were meant to be distributed to the market and to Lehman's shareholders, including Plaintiffs.  E&Y's reports incorporated by Lehman to promote Lehman's issuance and sale of securities to the market, including Plaintiffs, were issued in violation of E&Y's professional standards and duties.

79.    Further, E&Y must have known that Lehman was providing a group of institutional investors, including Plaintiffs, with audited financials in connection with the June 9 Offering.

80.     E&Y owed Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, including the Shelf Registration Statement, and any incorporated documents, at the time each such Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading.   E&Y did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Materials, including the Shelf Registration Statement were true, were without omissions of any material facts, and were not misleading.   Accordingly, E&Y acted negligently and is therefore liable to Plaintiffs.

81.     Plaintiffs did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

82.     Had E&Y not breached its duty of care and conducted a proper audit of Lehman, Plaintiffs would not have purchased Lehman securities.

83.     Plaintiffs were damaged as a result of E&Y's conduct.

84.     E&Y's conduct was a proximate cause of Plaintiffs' damages.

### COUNT III

### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against E&Y

85.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows.

86.     E&Y knew about Lehman's fraudulent practice of using Repo 105 Transactions to artificially de-leverage its balance sheet at the close of quarterly periods, knew that Lehman

used Repo 105 Transactions to report an artificially low net leverage ratio to the public and, despite this knowledge, failed to withdraw its clean audit opinion or otherwise require that Lehman disclose this information to the investing public.

87.     Indeed, E&Y was complicit in Lehman's scheme of using Repo 105 Transactions for the contrived purpose of appearing to reduce Lehman's net leverage ratio, improve its balance sheet, increase its liquidity, and deleverage its risk exposures.  Lehman's misleading and improper use of Repo 105 Transactions and E&Y's failure to bring the nature of these transactions to light, among other reasons, defrauded the Plaintiffs.

A.      **Repo 105 Transactions**

1.      **Lehman Utilized Repo 105 For A Fraudulent Purpose**

88.     As more fully described above, the undisclosed Repo 105 transactions were sham transactions with no legitimate business purpose or economic substance.

89.     Indeed, the Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was intentional, for deceptive appearances, had a material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

90.     Numerous members of Lehman's senior management have admitted as much, including the following:

(a)     Martin Kelly, Lehman's Global Financial Controller:

"[T]he only purpose or motive for the [Repo 105] transactions was reduction in balance sheet," and "there was no substance to the transactions."

[I]f an analyst or a member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or

> he needed, "they would have no transparency into [Lehman's] Repo 105 program."

> "[I]f there were more transparency to people outside the firm around the transactions, it would present a dim picture" of Lehman.

(b)    Joseph Gentile ("Gentile"), a FID executive who reported to Gerard Reilly, Lehman's Global Product Controller:

> stated "unequivocally that no business purpose for Lehman's Repo 105 transactions existed other than obtaining balance sheet relief." Gentile explained that Repo 105 transactions filled the gap between what Lehman could sell through normal business practices and the assets that Lehman needed to move off its balance sheet in order to meet balance sheet targets.

(c)    Edward Grieb ("Grieb"), Lehman's former Global Financial Controller who reported directly to Christopher M. O'Meara ("O'Meara"), Lehman's Chief Financial Officer, Controller, and Executive Vice President from 2004 until December 1, 2007:

> Repo 105 transactions were a balance sheet management mechanism; "a tool that could be used to reduce Lehman's net balance sheet."

(d)    Matthew Lee ("Lee"), a former Lehman Senior Vice President, Finance Division, in charge of Global Balance Sheet and Legal Entity Accounting through at least June 2008:

> Lehman would "sell" assets through Repo 105 transactions approximately four or five days before the close of a quarter and then repurchase them approximately four or five days after the beginning of the next quarter in order to "reverse engineer" its net leverage ratio for its publicly filed financial statements.

(e)    Kaushik Amin ("Amin"), former Head of Liquid Markets:

> Lehman reduced its net balance sheet at quarter-end by engaging in tens of billions of dollars of Repo 105 transactions and the Repo 105 inventory would return to Lehman's balance sheet a number of days after the opening of the new quarter. Amin e-mailed Kieran Higgins regarding the group's balance sheet at quarter-end on February 28, 2008, stating, "We have a desperate situation and I need another 2 billion from you, either through Repo 105 or outright sales. Cost is irrelevant, we need to do it."

(f)    Jerry Rizzieri ("Rizzieri"), a member of Lehman's Fixed Income Division:

E-mailed Mitchell King, the Head of Lehman's United States Agencies trading desk, just four days prior to the close of Lehman's 2007 fiscal year: "Can you imagine what this would be like without [Repo] 105?," in reference to meeting a balance sheet target.

Following the announcement of "new balance sheet targets for quarter end," Rizzieri wrote in an April 22, 2008 email to Kieran Higgins: "We will need to be focused very early in the process in order to meet these targets . . . [there is] no room for error this quarter," and "we also need to have a coordinated approach to repo 105 allocation."

(g)      Mitchell King, former Head of Lehman's United States Agencies trading desk, who on a weekly basis compiled lists of collateral available for Repo 105, told the Examiner:

[N]o business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet.

(h)      On April 12, 2008, Bart McDade ("McDade"), Lehman's Head of Equities from 2005-08 and COO from June to September 2008, received an email from Hyung Lee stating, "Not sure you are familiar with Repo 105 but it is used to reduce net balance sheet in our governments businesses around the world." McDade replied, "I am very aware . . . it is another drug we r on."

91.      Additional accounts by Lehman employees and contemporaneous e-mails during the relevant period confirm that there was no legitimate business purpose to the Repo 105 program.  For example:

- In July 2008, Michael McGarvey, a former senior vice president in FID, emailed a Lehman colleague, "[Repo 105] *is basically window-dressing.  We are calling repos true sales based on legal technicalities.*  The exec committee wanted the number cut in half."

- Paolo Tonucci, Lehman's former Treasurer, recalled that near the end of reporting periods, Lehman would deploy Repo 105 transactions to reduce its balance sheet. He also acknowledged that Lehman's use of Repo 105 transactions impacted Lehman's net leverage ratio.

- Ian Lowitt, Lehman's Chief Financial Officer as of June 12, 2008, admitted to the Examiner that Lehman established a "regime of limits," meaning balance sheet

targets, for each business unit to manage to and that Repo 105 was one way to "sell down assets" to meet the targets.

- Marie Stewart, Lehman's Global Head of Accounting Policy, called Repo 105 "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end."

- John Feraca, who ran the Secured Funding Desk in Lehman's Prime Services Group, stated: "Senior people felt urgency only in the sense of trying to get to their targets because the Finance Division wanted to report as healthy a balance sheet and leverage ratio as possible for investors, creditors, rating agencies and analysts." He added, "[i]t was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end."

92.     Lehman's Repo 105 transactions followed a conspicuous, cyclical pattern for each reporting period; they spiked significantly at each quarter end during the relevant period in an effort to reduce its balance sheet for its quarter end public reports.  For example, as the close of the first quarter of 2008 approached, Lehman's Repo 105 usage increased from $24.217 billion on February 15, 2008; to $31.029 billion on February 22, 2008; to $40.003 billion on February 28, 2009; and then jumped to $49.102 billion on February 29, 2008 (quarter-end).  Similarly, at the end of the second quarter of 2008, Repo 105 transactions exceeded $50 billion, whereas the intra-quarter dip as of April 30, 2008, was approximately $24.7 billion, and had been as low as $12.75 billion on March 14, 2008.

93.     The dollar values of Lehman's monthly outstanding Repo 105 transactions during the Company's fiscal quarters during the relevant period are shown below:

**Table**

| 08/31/07 | $36.4 billion (end of 3Q07 ) |
| 09/30/07 | $24.4 billion |
| 10/31/07 | $29.9 billion |
| 11/30/07 | $38.6 billion (end of 4Q07) |
| 12/31/07 | n.a. |
| 01/31/08 | $28.9 billion |
| 02/28/08 | $49.1 billion (end of 1Q08) |
| 03/31/08 | $24.6 billion |
| 04/31/08 | $24.7 billion |
| 05/31/08 | $50.4 billion (end of 2Q08) |

## 2.    **Material Misstatements By E&Y**

94.     During the relevant period, E&Y issued a clean audit opinion that was included in
Lehman's 2007 10-K representing "[w]e conducted our audit in accordance with the standards of
the Public Company Accounting Oversight Board" and that Lehman's financial statements
"present[ed] fairly, in all material respects, the consolidated financial position of Lehman . . . in
conformity with U.S. generally accepted accounting principles."   E&Y also issued interim
reports that were included in Lehman's Forms 10-Q which stated, "[w]e conducted our review in
accordance with the standards of the Public Company Accounting Oversight Board," and
"[b]ased on our review, we are not aware of any material modifications that should be made to
the consolidated financial statements . . . for them to be in conformity with U.S. generally
accepted accounting principles."  E&Y's statements in Lehman's 2Q07 10-Q, 3Q07 10-Q, 2007
10-K, 1Q08 10-Q and 2Q08 10-Q were materially false and misleading for the reasons set forth
above.

95.     E&Y provided continuing consent for Lehman's use of the clean audit opinion
and clean quarterly reviews in the Offering Materials that post-dated the issuance of the 2007

10-K.  As a result, E&Y knew that Lehman securities were being sold on the basis of E&Y's clean audit opinion throughout the entirety of the relevant period.

### 3.      E&Y's Scienter

96.      The Examiner found that E&Y knew about Lehman's use of Repo 105 transactions to manage its balance sheet at the end of each quarter.  According to the Examiner, E&Y was specifically informed about Lehman's Repo 105 transactions on several occasions, and E&Y "was made aware that [Lehman's] financial information may be materially misleading because of the failure to disclose the effect and timing and volume of Lehman's Repo 105 activities (which had a material effect on financial statement items)."

97.      In 2007, Lehman provided E&Y with a netting grid that identified and described various balance sheet mechanisms, including Repo 105 transactions.  The netting grid was provided to E&Y by no later than August 2007 (at the close of Lehman's 3Q07) and in November 2007 (at the close of its fiscal year).  Although E&Y used the netting grid in connection with the audit, E&Y's review and analysis did not take into account the large volumes of Repo 105 transactions Lehman undertook at quarter-ends, reflected therein.  When the Examiner asked William Schlich, E&Y's lead partner on the Lehman Audit Team, about the volume of Repo 105 transactions and whether E&Y should have considered the possibility that strict technical adherence to FAS 140 or another specific accounting rule could nonetheless lead to a material misstatement in Lehman's publicly reported financial statements, *Schlich refused to comment*.

98.      According to Martin Kelly, soon after he became Lehman's Global Financial Controller on December 1, 2007, he specifically spoke to Schlich in an effort to learn more about Lehman's Repo 105 program.  During that conversation, Kelly and Schlich specifically

discussed the fact that Lehman was unable to obtain a true sale opinion under United States law for Repo 105 transactions.

99.    E&Y was also made aware of Lehman's improper use of Repo 105 transactions during its investigation of claims made by a whistleblower.  On May 16, 2008, Matthew Lee, a Senior Vice President in Lehman's Finance Division responsible for its Global Balance Sheet and Legal Entity Accounting, sent a letter to Lehman management – including Kelly, former CFO Erin Callan and O'Meara – identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues.  Subsequently, Lee prepared another writing addressing additional accounting control issues – including the use of "Repo 105" transactions – which was sent to a Managing Director in Lehman's corporate compliance department.  Shortly after sending his first letter, Lee was interviewed by Joseph Polizzotto, Lehman's General Counsel, and Elizabeth Rudofker, Head of Corporate Audit.  On May 22, 2008, the day after that interview, Lee was terminated without warning.

100.    Approximately two weeks after Lee's termination, after he had communicated additional warnings about Repo 105, Lee was interviewed by Schlich and Hillary Hansen of E&Y.  According to Hansen's notes of the interview, Lee again warned E&Y about Lehman's Repo 105 practice including, notably, the enormous volume of Repo 105 activity that Lehman engaged in at quarter-end.  These E&Y notes recounted Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet at quarter-end through Repo 105 transactions and that these assets returned to the balance sheet about a week later.  When interviewed by the Examiner, Hansen specifically recalled conferring with Schlich about Lee's Repo 105 allegations.  However, despite E&Y's contemporaneous notes demonstrating the discussion of

Repo 105, Schlich told the Examiner that he did not recall Lee saying anything about Repo 105 transactions during the interview with Lee.

101.    Indeed, E&Y took affirmative steps to cover-up the Repo 105 fraud.  On June 13, 2008, the day after Lee specifically informed E&Y of the $50 billion in Repo 105 transactions that Lehman undertook at the end of the second quarter 2008, E&Y spoke to Lehman's Audit Committee regarding Lee's allegations.  Despite the fact that the Chair of the Audit Committee had clearly stated that he wanted a full and thorough investigation of every allegation made by Lee, E&Y failed to mention anything about Repo 105.  Similarly, on July 8, 2008, when the Audit Committee met with E&Y to review Lehman's 2Q08 financial statements, E&Y again failed to mention Lee's allegations regarding Repo 105, and stated that E&Y would issue an unqualified review report.  Then, on July 22, 2008, at an Audit Committee meeting where Lehman's Head of Corporate Audit made a presentation on the results of the investigation into Lee's allegations, E&Y again failed to mention Repo 105.  At that meeting, the Audit Committee was told that "[c]orporate audit has largely completed an evaluation of [Lee's] observations in partnership with Financial Control and Ernst & Young."  In subsequent meetings and private executive sessions thereafter, E&Y also did not disclose that Lee made an allegation related to Repo 105 transactions being used to move assets off Lehman's balance sheet at quarter-end.  According to the Chair of the Audit Committee, he would have expected to be told about Lee's Repo 105 allegations.  Another Audit Committee member similarly said that the volume of Lehman's Repo 105 transactions mandated disclosure to the Audit Committee as well as further investigation.

102.    Additionally, despite the directive to investigate every claim raised by Lee, E&Y did not follow up on Lee's allegations or conduct any further inquiry into the Repo 105

transactions.   In fact, after E&Y's June 12, 2008 interview of Lee in which he described

Lehman's moving $50 billion of inventory off its balance sheet at the end of the second quarter

2008, E&Y did not speak with him again.  Instead, less than four weeks after Schlich and Hansen

interviewed Lee, E&Y signed a Report of Independent Registered Public Accounting Firm for

Lehman's 2Q08 10-Q on July 10, 2008, certifying that it was not aware of any material

modifications that should be made to Lehman's financial statements for them to be in conformity

with GAAP, and similarly failed to amend or correct its most recent audit opinion on the 2007

final financial statements or its report on the 1Q08 financial statements.

103.    The Examiner concluded "that sufficient evidence exists to support a colorable

claim that":

> Ernst & Young should have made appropriate inquiries of management
> and performed analytical procedures concerning significant transactions
> that occurred at the ends of the quarters in 2008 and analyzed their impact
> upon the financial statements, including the footnotes.  Particularly after
> Lee alerted Ernst & Young to $50 billion in Repo 105 transactions prior to
> the filing of the second quarter Form 10-Q, Ernst & Young should have
> reported to senior management and the Audit Committee that Lehman was
> using Repo 105 transactions to temporarily and artificially reduce balance
> sheet and its net leverage ratio for reporting purposes, without disclosing
> the practice to the public.

> . . . Ernst & Young knew or should have known that the notes to the
> financial statements were false and misleading because, among other
> things, those notes describe all repos as "financings," which Ernst &
> Young knew was not the case, and those notes did not disclose the Repo
> 105 transactions.   Ernst & Young had a professional obligation to
> communicate the issue to both senior management and the Audit
> Committee and to recommend corrections of the Forms 10-Q, and also to
> either issue modified review reports noting the materially inadequate
> disclosures, or to withhold its review reports altogether.

**B.**    **Loss Causation**

104.    Between June 12, 2007 and September 15, 2008, the price of Lehman common

stock was artificially inflated as a result of the material misrepresentations and omissions set

forth above.  The artificial inflation was removed through a series of partial disclosures and the materialization of previously-concealed risks.

105.    On June 9, 2008, before the markets opened, Lehman issued a press release announcing its financial results for its second quarter of 2008 ending on May 31, 2008.  Despite having previously announced success with its deleveraging plan, its strong liquidity position, that it had risk management policies in place and that its assets were fairly valued, the press release disclosed that Lehman took $4 billion in mark-to-market write downs, including $2.4 billion in residential mortgage related holdings, $700 million in commercial positions, and $300 million in real estate held for sale.  In addition, Lehman announced that it would raise $6 billion through a combined offering of preferred and common shares offering (in which Plaintiffs participated).  On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44% over the next two days.  In addition, rating agencies Fitch and Moody's downgraded Lehman's credit rating.   However, the June 9 announcement only partially revealed the truth, and Lehman continued to misrepresent its financial condition.

106.    Plaintiffs did not know about these planned write downs at the time they purchased their Lehman securities or that Lehman was going to announce these write downs at the same time it would announce the combined Offerings.

107.    On September 8, 2008, Lehman announced that it would release its third quarter 2008 results and key strategic initiatives for the Company on September 18.   Analysts at Bernstein Research and Oppenheimer predicted further write downs in the third quarter of between $4 and $5 billion.  In addition, there were market reports of Lehman's potential sale of assets to raise capital, that market commentators said smacked of desperation and indicated

problems with Lehman's liquidity position.  As a result of this news, Lehman's shares finished the trading day down 12.7%.

108.    On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from the Korea Development Bank had failed, leading to concerns that "no one will inject capital" into Lehman.  In addition, S&P and Fitch both placed their ratings on Lehman on review for downgrade.  S&P specifically cited concerns about Lehman's ability to raise capital.  On this news, Lehman's shares declined 45% from the prior day's price to close at $7.79 per share.

109.    On September 10, 2008, Lehman reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross write downs on its residential and commercial real estate holdings, despite having previously announced success with its deleveraging plan, its strong liquidity position, that it had risk management policies in place and that its assets had been fairly valued.  In announcing the results during the conference call, Lowitt, having replaced Callan as CFO, also disclosed that "[t]he majority of our write downs were in Alt-A driven by increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges."  Contrary to earlier statements by Lehman executives, Lowitt admitted that "[u]nfortunately there is no direct hedge for Alt-A assets. . . ." In addition, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating.  On this news Lehman's shares declined 7% from the prior days close to $7.25 per share.

110.    On September 15, 2008, Lehman filed for bankruptcy protection because it had "significant liquidity problems."  As a result, Lehman's shares declined over 94% on that date.

111.    The disclosures regarding Lehman's massive write-downs and liquidity problems (which led to Lehman's bankruptcy) revealed the truth about Lehman's financial condition and

represented the materialization of several interrelated, concealed risks from Lehman's disregard for its risk limits and its massive Repo 105 transactions which masked the Company's net leverage and true liquidity issues.  During the relevant period, in order to conceal the problems with its balance sheet, and in particular the amount of troubled assets it held, Lehman engaged in tens of billions of dollars worth of Repo 105 transactions in order to remove temporarily assets from its balance sheet solely for reporting purposes.  Through these sham transactions, Lehman artificially reduced its net leverage ratio, fraudulently preserved its credit ratings, and created the appearance that Lehman was more capitalized and liquid than it really was.  As the Examiner found, Lehman's Repo 105 program concealed the adverse impact its increasingly "sticky" inventory – which consisted mostly of illiquid residential and commercial real estate that Lehman could not sell without taking significant losses – was having on Lehman's publicly reported net leverage and balance sheet.

112.    In sum, through the use of Repo 105, Lehman led the market to believe that Lehman had effectively de-leveraged its balance sheet and reduced its exposure to risky assets when, in fact, the opposite was true.  Accordingly, the disclosures referenced above revealed what the Repo 105 transactions had concealed; namely, that Lehman held a massive amount of illiquid assets that required write-downs of billions of dollars, that Lehman's leverage was higher than reported, and that Lehman's liquidity had been misrepresented.

113.    The declines in the price of Lehman's common stock and resulting losses are directly attributable to the disclosure of information and, more importantly, the materialization of risks that were previously misrepresented or concealed by E&Y.  Had Plaintiffs known of the material adverse information not disclosed by Lehman and E&Y or been aware of the truth

behind their material misstatements, Plaintiffs would not have purchased Lehman common stock or preferred shares at artificially inflated prices or at all.

114.    E&Y, by the use of means or instrumentalities of interstate commerce and/or of the United States mail (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (3) deceived the investing public, including Plaintiffs; (4) artificially inflated and maintained the market price of Lehman common stock; and (5) caused Plaintiffs to purchase Lehman common stock and preferred shares at artificially inflated prices and suffer losses.

115.    E&Y had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were readily available to it.  E&Y's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman's financial condition and results of operations, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.

116.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman common stock and preferred shares were artificially inflated and caused loss to Plaintiffs when Lehman's stock price fell in response to the issuance of partial corrective disclosures and the materialization of risks previously concealed by E&Y.

117.    By virtue of the foregoing, E&Y violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

118.    As a direct and proximate result of the wrongful conduct of E&Y, Plaintiffs suffered damages in connection with their acquisitions of Lehman's common stock.

**COUNT IV**

**<u>Fraud</u>**

119.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows.

120.    E&Y, in connection with its audits, made material misstatements and material omissions concerning the financial statements of Lehman and Lehman's financial health by failing to conduct its audits in connection with GAAP and GAAS and ignored several red flags, as detailed above, during the course of its audit.

121.    The accuracy of Lehman's audited financial statements is a material fact to public investors in Lehman such as Plaintiffs.

122.    E&Y, at the time it conducted its audits and issued its audit opinion, which it knew would be included in Lehman's various public filings with the SEC, knew that the audited financial statements were false and materially misleading.

123.    E&Y intended public investors, such as Plaintiffs, to rely upon the audited financial statements of Lehman when making a decision to invest in Lehman.

124.    Plaintiffs did, in fact, reasonably rely upon E&Y's audited financial statements in deciding upon whether to purchase the Lehman securities at issue.

125.    Plaintiffs were injured because of their reliance upon E&Y's material misstatements and omissions.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(a)     Awarding Plaintiffs damages in an amount which may be proven at trial, together with interest thereon;

(b)     Awarding Plaintiffs pre-judgment and post-judgment interest, as well as their reasonable attorneys' fee and expert witness' fees and other costs;

(c)     Awarding Plaintiffs rescission and/or rescissionary damages; and

(d)     Such other relief as this Court deems appropriate.

Dated: New York, New York
          June 2, 2011

Respectfully submitted,

MCDERMOTT WILL & EMERY LLP

By: _____
Banks Brown
John J. Calandra
Michael R. Huttenlocher
340 Madison Avenue
New York, New York  10173-1922
(212) 547-5400

*Attorneys for Plaintiffs Starr International U.S.A. Investments LC and C.V. Starr & Co., Inc. Trust*