**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Civil Action No. 09 MD 2017 (LAK) |
| LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | ECF CASE |
| This Document Applies to: | |
| *Starr International U.S.A. Investments LC, et al. v. Ernst & Young LLP*, No. 11-cv-3745-LAK; | |
| *The State of New Jersey, Department of Treasury, Division of Investment v. Richard S. Fuld, Jr., et al.*, No. 10-cv-05201-LAK; | |
| *Vallejo Sanitation and Flood Control District v. Fuld, et al.*, No. 1:09-cv-06040-LAK; *Mary A. Zeeb, Monterey County Treasurer, on Behalf of the Monterey County Investment Pool v. Fuld, et al.*, No. 1:09-cv-01944-LAK; *Contra Costa Water District v. Fuld, et al.*, No. 1:09-cv-06652-LAK; *City of Burbank v. Fuld, et al.*, No. 1:09-cv-03475-LAK; *City of San Buenaventura v. Fuld, et al.*, No. 1:09-cv-03476-LAK; *City of Auburn v. Fuld, et al.*, No. 1:09-03474-LAK; *The San Mateo County Investment Pool v. Fuld, et al.*, No. 1:09-cv-01239-LAK; *Zenith Insurance Company v. Fuld, et al.*, No. 1:09-cv-01238-LAK; | |
| *American National Insurance Company et al. v. Richard S. Fuld, Jr., et. al.*, No. 1:09-cv-02363-LAK; and | |
| *Retirement Housing Foundation et al., v. Fuld, et al.*, No. 1:10-cv-06185-LAK. | |

**MEMORANDUM OF LAW IN SUPPORT OF CERTAIN OPT-OUT PLAINTIFFS'**
**MOTION TO EXCLUDE THE TESTIMONY OF STEPHEN G. RYAN**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

STANDARD OF LAW.................................................................................................... 4

ARGUMENT .................................................................................................................. 6

I.  RYAN LACKS A RELIABLE BASIS FOR HIS OPINION THAT REPO 105
    TRANSACTIONS WERE PROPERLY ACCOUNTED FOR UNDER FAS 140.......... 6

II. RYAN SHOULD BE PRECLUDED FROM TESTIFYING ON MATTERS OF
    DISCLOSURE AND FAIR PRESENTATION ............................................................. 11

    A.  Ryan's Opinions Concerning Disclosure and Fair Presentation Directly
        Conflict with Controlling Legal Precedent .......................................................... 11

    B.  Ryan's Opinions Concerning Disclosure Are Unsupported by the Relevant
        Accounting Principles ........................................................................................ 13

    C.  Ryan Lacks the Requisite Expertise to Opine on Matters of Disclosure ............. 15

III. RYAN'S OPINIONS CONCERNING LEHMAN'S MISLEADING FOOTNOTE
     DISCLOSURES INVADE THE PROVINCE OF THE JURY...................................... 19

IV. RYAN'S OPINIONS BASED UPON MATERIALITY IMPROPERLY INVADE
    THE PROVINCE OF THE JURY AND SHOULD BE PRECLUDED ........................ 21

    A.  Ryan's Opinion that Lehman's Failure to Disclose Repo 105 Was
        Immaterial to Reasonable Investors Should Be Precluded ................................. 22

    B.  Ryan's Opinions that Repo 105 was Immaterial and, Thus, Not Required
        to be Disclosed by APB 22 Should Be Precluded ............................................. 23

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)..........................................................................6, 7, 15

*AstraZeneca LP v. Tap Pharm. Prods., Inc.*,
  444 F. Supp. 2d 278 (D. Del. 2006)....................................................................19, 25

*In re Blech Securities Litig.*,
  No. 94 Civ. 7696(RWS), 2003 WL 1610775 (S.D.N.Y Mar. 26, 2003) ...............................13

*Certain Underwriters at Lloyd's v. SSDD LLC*,
  No. 4:13-CV-1, 2014 WL 3097284 (E.D. Mo. July 7, 2014)..........................................21, 22

*Daubert v. Merrell Dow*,
  509 U.S. 579 (1993)........................................................................... *passim*

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
  No. 04-md-1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) ...........................................7

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...............................................................................6

*In re Global Crossing Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004).............................................................11, 12

*Highland Cap. Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005)..............................................................10, 21

*Hill v. Equitable Bank*,
  No. 82-220, 1987 WL 8953 (D. Del. Mar. 3, 1987) .................................................21, 22

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  No. 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ................................5

*Kumho Tire Co., Ltd v. Carmichael*,
  526 U.S. 137 (1999)...............................................................................10

*In re Lehman Brothers Sec. & ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)............................................................3, 4, 12, 20

*In re Rezulin Prod. Liab. Litig*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)............................................................5, 10, 19, 25

*In re Rezulin Prods. Liab. Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005)......................................................................8

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................. *passim*

*Snyder v. Wells Fargo Bank*,
    No. Civ. 4496(SAS), 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ......................5, 11, 13, 21

*United States v. Ebbers*,
    458 F.3d 110 (2d Cir. 2006)...............................................................................11

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)...............................................................................5, 7

## Other Authorities

4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence (Joseph
    M. McLaughlin, ed. Matthew Bender 2d ed. 2014) § 702.02 ...............................4, 5

Federal Rule of Evidence 403.............................................................................5

Federal Rule of Evidence 702.................................................................. *passim*

The Opt-Out Plaintiffs[1] respectfully submit this Memorandum of Law in Support of their Motion to Exclude the Testimony of Professor Stephen G. Ryan, proffered as an expert by Ernst & Young ("EY") in the Lehman MDL, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993).[2]

## PRELIMINARY STATEMENT

EY retained Stephen G. Ryan ("Ryan") to provide expert testimony in this action on whether Lehman – and by extension EY – appropriately accounted for Repo 105 under Statement of Financial Accounting Standard ("FAS") 140 and that Lehman's disclosures of Repo 105 transactions complied with Generally Accepted Accounting Principles ("GAAP").  Although Ryan is a Professor of Accounting and Director of the Accounting Program at the Stern School of Business at New York University, the opinions he has offered should be precluded.  Simply put, Ryan's proffered opinions lack the requisite factual foundation, contradict controlling law and corresponding accounting literature, and invade the province of the jury in determining the facts and this Court in instructing the jury on the law.  In short, Ryan's opinions lack the reliability and relevance required to be admitted in evidence and should be precluded.

First, at the root of his proffered testimony, Ryan opines that Lehman's (and EY's) accounting for Repo 105 transactions technically complied with FAS 140.  Ryan states that Repo 105 transactions met three required elements under FAS 140 – isolation, pledge or exchange, and effective control – and, thus, "*requiring* Lehman to account for the transactions as sales of the

---

[1] Unless otherwise stated, the abbreviations herein are the same as in Certain Opt-Out Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendant Ernst & Young LLP's Motion for Summary Judgment, filed under seal on September 19, 2014 (a redacted public version was filed on October 6, 2014 at Master Dkt. No. 1521).

[2] EY submitted the entirety of the Expert Report of Stephen G. Ryan ("Ryan Report"), dated November 22, 2013, as Exhibit 62 to the Declaration of Kevin McDonough, dated September 19, 2014, in support of its Motion for Summary Judgment.  The McDonough Decl. was filed under seal on August 8, 2014.  A redacted public version was filed on August 8, 2014 at Master Dkt. No. 1485.

transferred assets."  (Ryan Report ¶ 23) (emphasis added).[3]  Ryan's opinion, however, should be precluded because this opinion lacks a proper factual foundation.  As discussed below, Ryan failed to review any of the individual Repo 105 transactions to determine whether it met these three criteria.  He simply assumed, without basis, that they did.  Worse, he also ignored evidence that suggested the contrary.  For instance, he failed to consider ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████  This email aside, Ryan also ignored that nothing in Lehman's Repo 105 Policy would have precluded Lehman from re-purchasing the same securities in connection with each and every transaction.  Ryan's unsupported assumptions that Repo 105 met the three pre-requisites of FAS 140 (*i.e.*, without actually reviewing the underlying transactions), and his failures to consider facts that contradict the existence of the isolation condition, render his opinion that the transactions met the conditions of FAS 140 inadmissible.

Second, Ryan opines that because Lehman's accounting for Repo 105 transactions technically complied with FAS 140 – by definition – they fairly presented Lehman's financial condition in accordance with GAAP.  He specifically opines that if Lehman's "accounting of . . . Repo 105s accords with FAS 140 then they are fairly presented as it relates to FAS 140 as it relates to Repo 105."  (Edling Decl. Ex. 13, Expert Deposition of Stephen G. Ryan in *In re Lehman Bros. Secs. & ERISA Litig.*, 09 MD 2017, dated April 8, 2014 ("Ryan Dep.") at 113:13-19.)  Asked if there is "any circumstance where despite technical compliance with FAS 140 the financial statements that result from that could fail to fairly present the company's financial

---

[3] The Ryan Report is attached to the Declaration of Matthew K. Edling, dated October 17, 2014 ("Edling Decl.") as Exhibit 4.

condition" "with respect to those [Repo 105] transactions," Ryan answered: "No." (*Id.* at 189.)

Even assuming that Ryan can opine that Repo 105 transactions were properly accounted for under FAS 140, Ryan's "fair presentation" opinion is directly contradicted by this Court in *Lehman I*[4] and the Second Circuit, both of which have squarely held that mere compliance with technical accounting rules does **not** mean that a company's financial statements fairly present the financial condition of the company in accordance with GAAP.  When read practically verbatim quotes from this Court's opinion in *Lehman I* on this very point, Ryan testified, rather bluntly, that he "disagree[s] with the judge."  (Edling Decl. Ex. 13, Ryan Dep. at 205:6-13.)  This Court was in good company, however, since Ryan likewise disagreed with the Second Circuit as well when read similar quotes from the Second Circuit.  It is, of course, the Court's views that shall guide the jury here, not Ryan's.  Additionally Ryan's subjective views in this regard are his own – they are not shared by any academic or other literature or reflective of generally accepted accounting principles.  Finally, and not surprisingly, despite offering numerous opinions concerning Lehman's disclosures, Ryan admitted that he is not an expert with respect to disclosure issues. As a result, Ryan's opinions concerning these disclosure issues should be deemed inadmissible.

Third, Ryan offers an opinion on the meaning of the text in Lehman's footnote disclosure concerning repurchase transactions being accounted for as secured financings.  As stated in the Opt-Out Plaintiffs' summary judgment papers, the Opt-Out Plaintiffs contend that the text of Note 1 of Lehman's footnote disclosures in its 10-K filings misinformed the public that *all* of Lehman's repurchase transactions were accounted for as financings.  The meaning of that footnote disclosure should be determined by the jury, not Ryan.  Ryan, however, seeks to usurp

---

[4] *In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ("Lehman I").

that role when he offers an opinion that this "disclosure simply does not imply that Lehman accounted for all of its repurchase agreements as secured borrowings" and "that Lehman meant more than securitizations when it used the term 'transfers of financial assets'." (Edling Decl. Ex. 4, Ryan Report ¶¶ 64, 71.)  Not only does Ryan's opinion purport to conclude what this Court believed it could not as a matter of law in its opinion in *Lehman I*, Ryan goes one step further – he offers his expert opinion as to Lehman's state of mind, *i.e.*, telling the jury what "Lehman meant" when it wrote the footnote disclosure.  Such opinion testimony is improper and should be precluded.

Finally, Ryan offers additional opinions which all rest on what Ryan deems to be "material."  He opines that (i) "Lehman's use of sale accounting . . . did not mislead reasonable knowledgeable users . . . about Lehman's financial leverage in general or its disclosed net leverage ratio in particular, primarily because the securities involved were liquid." (Edling Decl. Ex. 4, Ryan Report ¶ 17); and (ii) Repo 105 "did not materially affect Lehman's financial statements."  (Edling Decl. Ex. 13, Ryan Dep. at 158:20-23) and, thus, a disclosure concerning the accounting treatment for Repo 105 was not necessary.  Determinations of materiality, however, are quintessential jury issues and are not appropriate for expert testimony.  Moreover, Ryan's experience nowhere gives him the expertise to tell the jury what a reasonable investor in Lehman would have found to be material.  For these reasons, and those more fully stated below, Ryan's testimony should be precluded in full.

## STANDARD OF LAW

The Supreme Court has explicitly recognized the "danger of prejudice resulting from the presentation of expert testimony  . . . because of the potential for the jury to automatically accept an expert witness' testimony."  4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence (Joseph M. McLaughlin, ed. Matthew Bender 2d ed. 2014) ("Weinstein") § 702.02; *see*

4

*also Daubert*, 509 U.S. at 595 ("[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."). That potential danger is even greater where, as here, the expert's impressive pedigree is likely to place "scientific evidence [proffered by the expert in the] posture of mythic infallibility." Weinstein § 702.02.

In *Daubert*, the Supreme Court established the procedures for determining whether proffered expert testimony is admissible. Specifically, the Supreme Court charged trial courts with a "gatekeeping" role to "ensure that any and all [expert] testimony or evidence admitted is *not only relevant, but reliable*." *In re Rezulin Prod. Liab. Litig*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (citing *Daubert*, 509 U.S. at 589) (internal quotations omitted) (emphasis added); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (trial court should ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). Rule 702 incorporates the principles established in *Daubert.*

*Daubert* requires a court to determine "(1) whether the proposed expert is in fact qualified to offer the opinions he or she is proffering; (2) whether each proposed opinion is based upon reliable data and methodology; and (3) whether the proposed testimony would be helpful to the trier of fact or to answer the factual question presented." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 1223844, at *28 (S.D.N.Y. Mar. 27, 2013) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). Moreover, expert testimony is inadmissible if it "usurp[s] either the role of the trial [district] court judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Snyder v. Wells Fargo Bank*, No. Civ. 4496(SAS), 2012 WL 4876938, at *2

(S.D.N.Y. Oct. 15, 2012) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Importantly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there simply is too great an analytical gap between the data and the opinion proffered." *Id.*

"The party seeking to introduce and rely on expert testimony bears the burden of establishing that the proposed expert and his or her testimony meets the requirements of Rule 702 by a preponderance of the evidence." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (internal quotations omitted). As discussed below, EY cannot meet its burden with respect to the opinions offered by Ryan.

## ARGUMENT

## I.     RYAN LACKS A RELIABLE BASIS FOR HIS OPINION THAT REPO 105 TRANSACTIONS WERE PROPERLY ACCOUNTED FOR UNDER FAS 140

Ryan offers the opinion that "FAS 140 required Lehman to account for the Repo 105 transactions as sales." (Edling Decl. Ex. 4, Ryan Report ¶ 17.) In support of this opinion, in Paragraphs 27 through 41 of his Report, Ryan identifies three conditions that must be met under FAS 140 in order to account for repurchase transactions as "sales." According to Ryan, these three conditions are the "isolation condition," "pledge or exchange condition," and the "effective control condition." Ryan opines that "Lehman met all three conditions . . . and hence FAS 140 required Lehman to account for these [Repo 105] transactions as sales of these securities." (*Id.* ¶ 41.)

Ryan lacks any reliable basis for this opinion because he failed to conduct any investigation whatsoever into the actual Repo 105 transactions to confirm that these three conditions were actually met by the transactions at issue. *See Amorgianos v. Nat'l R.R.*

*Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* or Rule 702 mandate the exclusion of that unreliable opinion testimony."); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (trial court should ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").  Ryan admittedly does not know if any, let alone, all of Lehman's Repo 105 transactions in fact met the three conditions he enumerated:

> Q.:   Have you done any independent analysis to verify whether each
>        individual Repo 105 transaction that Lehman entered into in fact
>        met the conditions of FAS 140?
>
> A.:   No.  To the best of my knowledge that data is not available.

(Edling Decl. Ex. 13, Ryan Dep. at 262:7-12; s*ee also id.* at 264:2-15 (reiterating that he did not look at individual Repo 105 transactions and compare whether they met the requirements of FAS 140 in each case).)

Quite obviously, having failed to determine whether the individual Repo 105 transactions in fact met the conditions of FAS 140, he cannot properly opine that "Lehman met all three conditions . . . and hence FAS 140 recorded Lehman to account for these transactions as sales of these securities."  *See Amorgianos*, 303 F.3d at 266-67 ("The judge should only exclude the evidence if . . . the expert lacks good grounds for his or her conclusions."); *Williams*, 506 F.3d at 160.

Ryan's failure to form a reliable factual basis, however, goes well beyond a lack of investigation.  He also ignored evidence that was contrary to his opinion, which is an independent and additional basis for excluding his testimony.  *See In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009) ("[F]ailure to discuss the import of, or even mention, [the] material facts . . . amounts to cherry-

picking the facts . . . , and such selective use of facts fails to satisfy the scientific method and *Daubert*.") (internal quotations omitted); *see also In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (stating that failure "to explain information that otherwise would tend to cast doubt on that theory is inherently suspect"); Fed. R. Evid. 702 Advisory Committee Note ¶ 4(3) (stating that courts also consider '[w]hether the expert has adequately accounted for obvious alternative explanations" "in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact."). For example, Ryan acknowledged that the Linklaters' "true sale" opinion contained, as an important caveat, the condition that Lehman did not have an understanding with its counterparties to transfer back to Lehman the same securities that Lehman "sold" to its counterparties in its Repo 105 transactions. (Edling Decl. Ex. 13, Ryan Dep. at 280:10-281:7.)  Linklaters said that such a deal would render its "true sale" opinion ineffective, as that would be a "sham."  (Edling Decl. Ex. 33, Letter from Linklaters to Lehman re:  Repurchase Transactions under a Global Master Repurchase Agreement," dated May 31, 2006 ("Linklaters Letter"), MDL Ex. 1915, at LBEX-LBIE 000001-9.)  Ryan acknowledged that in such event, Linklaters' "opinion would not hold" and that, as a consequence, the Repo 105 transactions could not be regarded as a "sale" under FAS 140.  (Edling Decl. Ex. 13, Ryan Dep. at 280:10-281:7.)  Ryan maintained, however, that he "didn't see any evidence" that the parties' common intention was to sell back the same, as opposed to the equivalent securities.  (*Id.* at 281:17-282:6.)

But, it was for Ryan, as the purveyor of the opinion that Lehman's Repo 105 transactions met the requirements of FAS 140, to have a factual basis for that opinion.  He needed to determine affirmatively that the Repo 105 transactions met those conditions in practice, not just

in theory.  However, if Ryan had taken the steps required to form a reliable basis for an opinion, he would have discovered that there was evidence contradicting his view.

First, Lehman's Repo 105 policy, on which Ryan seems to rely exclusively, does not even prohibit Lehman from receiving or transferring back the <u>same</u> (as opposed to equivalent) securities to its Repo 105 counterparties, *i.e.*, the condition that would have rendered the transaction a "sham" according to Linklaters.  (*See* Edling Decl. Ex. 31, Lehman Brothers Holdings Inc. Accounting Policy Manual, dated September 9, 2006, MDL Ex. 1123 at LBHI_DE_04307420-422; Edling Decl. Ex. 33, Linklaters Letter, MDL Ex. 1915, at LBEX-LBIE 000001-9.)

Moreover, Ryan failed to consider a contemporaneous Lehman document, quoted by one of Opt-Out Plaintiffs' experts, ███████████████████████████████████ ████████████████████████████  (*See, e.g.*, Edling Decl. Ex. 30, ████████████ ████████████████████████████████  dated March 26, 2001, MDL Ex. 193, EY-LBHI-KEYPERS_10880225-227 at 226██████████████████████████████████ ████████████████████████████; *see also* Edling Decl. Ex. 13, Ryan Dep. at 282:7-16.)  Ryan ignored this evidence and simply assumed, without basis or investigation, that the transactions met the FAS 140 criteria.  Accordingly Ryan lacked a factual basis, let alone a reliable one, for his opinion that Repo 105 transactions complied with FAS 140.

Ryan also acknowledged that to be considered a "sale" under FAS 140 there needed to be reasonable assurance that the Repo 105 assets were "beyond the reach of a bankruptcy trustee," but Ryan lacked the underlying foundation to reach such a conclusion and lacks the requisite experience to make that judgment independently.  (*Id.* at 264:16-265:8.)  Ryan could not point to facts in the record on which one could reasonably have concluded that this condition was met.

(*Id.* at 264:16-265:21; 267:12-268:14; 270:23-273:3.)  Ryan acknowledged that he did not have "any expertise in determining whether a particular sale transaction is in fact beyond the reach" of a bankruptcy trustee.  (*Id.* at 265:15-21.)  In opining that EY has reasonable assurance that the assets underlying Repo 105 transactions were beyond the reach of a bankruptcy trustee, Ryan relied exclusively on the Linklaters' opinion, but that opinion only stated that the Repo 105 sale was a "true sale" under UK law (assuming the assumptions and caveats set forth in the opinion were all met).

Ryan acknowledged that nothing in the Linklaters' opinion even mentioned the word "bankruptcy" or even "trustee," let alone discussed the issue.  (*Id.* at 268:4-8.)  Recognizing this, Ryan explained that "my *reading* of the Linklaters letter and a general understanding [that he had was] that true sale opinions *imply* bankruptcy remoteness."  (*Id.* at 265:3-11.)  But, Ryan is admittedly not a lawyer, and he has no expertise in interpreting true sale opinions.  In fact, he stated that he did not "think [he] ha[d] ever seen [one] for repurchase agreements."  (*Id.* at 268:15-22.)  He testified that his experience with regard to true sale opinions was limited to those relating to securitizations, and even as to those, he said he seen less than a handful in his entire career, none of which were under UK law, as the Linklaters' opinion was.  (*Id.* at 268:23-269:5; 273:24-276:9.)

Thus, in addition to lacking a proper factual foundation for his opinion, Ryan lacks the requisite experience to provide an opinion in this area.  *See Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 156 (1999) (stating that the key question is "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case."); *see also Rezulin*, 309 F. Supp. 2d at 542-43 (stating that Rule 702 requires that "expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported

speculation.") (internal citations omitted); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("an expert basing his opinion solely on experience must do more than aver conclusorily that his experience led to his opinion, and . . . must do more than propound a particular interpretation of [particular] conduct.") (internal citations omitted).

## II.    RYAN SHOULD BE PRECLUDED FROM TESTIFYING ON MATTERS OF DISCLOSURE AND FAIR PRESENTATION

### A.    Ryan's Opinions Concerning Disclosure and Fair Presentation Directly Conflict with Controlling Legal Precedent

Expert testimony is only relevant (and potentially admissible) if it "does not usurp . . . the role of the trial court judge in instructing the jury as to the applicable law." *Snyder*, 2012 WL 4876938, at *2. Ryan's opinions concerning fair presentation run afoul of this well-established legal principle and, thus, are inadmissible. Ryan opines that "Lehman's financial statements were fairly presented in accordance with GAAP with respect to the Repo 105 transactions" because allegedly "GAAP required Lehman to account for the Repo 105 transactions as sales." (Edling Decl. Ex. 4, Ryan Report ¶ 125.) Ryan reaffirmed this opinion during his deposition and specifically testified that if Lehman's "accounting of . . . Repo 105s accords with FAS 140 then they are fairly presented as it relates to FAS 140 as it relates to Repo 105." (Edling Decl. Ex. 13, Ryan Dep. at 113:13-19.) Asked if there is "any circumstance where despite technical compliance with FAS 140 the financial statements that result from that could fail to fairly present the company's financial condition" "with respect to those [Repo 105] transactions," Ryan answered: "No." (*Id.* at 189.)

Ryan's opinions directly conflict with controlling precedent and should be precluded. As recognized by the Second Circuit, technical compliance with FAS rules alone do *not* mean that the financial statements fairly present in accordance with GAAP. *See United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006) ("GAAP itself recognizes that technical compliance with

11

particular GAAP rules may lead to misleading financial statements"); *In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) ("GAAP's ultimate goals of fairness and accuracy in reporting require more than mere technical compliance"); *Id.* at 340 ("While adherence to generally accepted accounting principles is a tool to help achieve [fair presentation], it is not necessarily a guarantee of fairness"); Securities Act Release No. 33-8112, Exchange Act Release No. 34-46225, July 18, 2002 ("Even if the transactions complied with GAAP, [a company will still] require to evaluate the material accuracy and completeness of the presentation made by its financial statements").

Indeed, in *Lehman I*, this Court plainly stated "[t]he fact that Lehman's accounting for the Repo 105 transactions technically complied with SFAS 140 does not mean that Lehman's financial statements complied with GAAP. . . 'GAAP itself recognizes that technical compliance with particular GAAP rules may lead to misleading financial statements, and imposes an overall requirement that the statements as a whole accurately reflect the financial status if the company.'" *Lehman I*, 799 F. Supp. 2d at 279 (quoting *Ebbers*, 458 F.3d at 126).

Asked about these generally accepted principles, as recognized by this Court and in numerous court decisions, Ryan simply disagreed:

Q.:    . . . [D]o you disagree with the Judge [Kaplan's] view that compliance with FAS 140 here does not necessarily lead to a fair presentation of or a financial statement that is not misleading?

A.:    I do disagree with the Judge.  (Edling Decl. Ex. 13, Ryan Dep. at 205:6-13.)

*        *        *        *

Q.:    Do you agree that . . . GAAP itself recognized that technical compliance with particular GAAP rules may lead to misleading financial statements? . . .

A.:    I generally disagree with that.  (*Id.* at 205:21-206:5.)

         \*     \*     \*     \*

Q.:    Do you agree that . . . GAAP imposed an overall requirement that the statements as a whole accurately reflect the financial status of the company?

A.:    No.  (*Id.* at 207:3-8.)

         \*     \*     \*     \*

Q.:    Do you agree that . . . GAAP's ultimate goals of fairness and accuracy and reporting require more than mere technical compliance with GAAP rules? . . . .

A.:    "GAAP does not require more than mere technical compliance with GAAP, no."  (*Id.* at 207:9-20.)

Although Ryan acknowledged that there is "case law" that undermines his opinion, he steadfastly maintained his disagreement with it.  He likewise admitted that there is also literature that contradicts the position he is taking.  (*Id.* at 201:19-202:2.)  He further acknowledged that the SEC "in its enforcement mode" has similarly disagreed with his position and has taken the contrary position, i.e., that compliance with a particular FAS rule does not guarantee a fair presentation of a company's financial position or that the financial statements are not misleading.  (*Id.* at 202:10-204:9.)  Despite the weight of this generally accepted authority to the contrary, Ryan maintained his position.  Thus, this opinion should be precluded.  *See Snyder*, 2012 WL 4876938, at \*2 (excluding testimony that invaded province of jury).

**B.     Ryan's Opinions Concerning Disclosure Are Unsupported by the Relevant Accounting Principles**

As discussed in Section IIA *infra*, an expert may not invade the province of the jury.  *See In re Blech Securities Litig.*, No. 94 Civ. 7696(RWS), 2003 WL 1610775, at \*21 (S.D.N.Y Mar. 26, 2003) (precluding expert testimony that "stated ultimate legal conclusions based on [certain] facts, which are in the jury's realm to decide.").  During his deposition, Ryan was given the opportunity to defend his opinion as he was asked "what specific authorities . . . can you cite

. . . for the proposition that compliance with FAS 140 or some other particular FAS rule by definition means that the financial statements are fairly presented and not misleading?" (Edling Decl. Ex. 13, Ryan Dep. at 189:14-190:7.) Ryan cited only to SAS 69, which he referred to as an "auditing rule," "along with Rule 203 of the AICPA Code of Professional Ethics." (*Id.* at 189:14-190:7.) Asked if there is anything apart from Rule 203 and SAS 69 that would support his view, he responded that "this is well outside the scope of my Report," but reaffirmed that his views were based entirely upon Rule 203 and SAS 69.[5] (*Id.* at 191:5-19.) The problem for Ryan, however, is that Rule 203 and SAS 69 do not support his view. Indeed, they contradict his view.

Ryan relies on SAS 69 ¶ 5(a) and opines that "SAS 69's accounting hierarchy provided a *prima facie* strong and in practice virtually insuperable reason for Lehman to follow FAS 140's requirements and for EY to provide an unqualified opinion on Lehman's financial statements only if Lehman followed FAS 140's requirements." (Edling Decl. Ex. 4, Ryan Report ¶ 120.) However, ¶ 5(a) of SAS 69 also says that: "Nevertheless, rule 203 provides for the possibility that literal application of such a [GAAP] pronouncement might . . . result in misleading financial statements." (Edling Decl. Ex. 42, SAS 69 ¶ 5(a).) This sentence, which is not cited in the Ryan Report, was read to Ryan at his deposition, as it contradicts Ryan's assertion that technical compliance with FAS 140 pronouncements is necessarily sufficient to have a non-misleading, fair presentation. Ryan could only respond: "that is what it says." (Edling Decl. Ex. 13, Ryan Dep. at 229:18-230:18.)

---

[5] It should be noted that Ryan cited SAS 69 at several points in his expert report (*see, e.g.*, ¶¶ 119, 120, 123, 124) in connection with his opinions concerning fair presentation. It can hardly be said that questions concerning his rationale for such opinions and his reliance on SAS 69 were "outside the scope" of his expert report.

Ryan was also presented with ¶ 4 of SAS 69, Item C, which states that "for purposes of determining whether the financial statements fairly present an entity's financial position," it is *not* sufficient that the entity chose the correct accounting principle; rather, it must "also . . . look at whether the financial statements and their notes are informative of matters that might affect their use, understanding and interpretation." (*Id.* at 232:3-233:8.)  Ryan likewise agreed that "is what the sentence says." (*Id.*)  Here, again, the very **same** SAS 69 that Ryan relied on actually contradicts his assertion that choosing the correct accounting principle was alone sufficient to make Lehman's financial statements fairly presented.  Accordingly, Ryan lacks a sufficient factual foundation for his opinion and it should be precluded.  *See Amorgianos*, 303 F.3d at 267.

Moreover, Ryan's Report cites no academic literature that *supports* his view that compliance with SFAS 140 (or any other technical SFAS rule) means that a company's financial statements are fairly presented.  He admitted that, despite having written several articles and books, he never expressed the position that compliance with a particular FAS principle means there is a fair presentation and that the financial statements are not misleading.  (Edling Decl. Ex. 13, Ryan Dep. at 199:5-201:3.)

### C.      Ryan Lacks the Requisite Expertise to Opine on Matters of Disclosure

Though Ryan cited SAS 69 and Rule 203 as his sole support for his personal, subjective view that compliance with FAS 140 was sufficient to render Lehman's financial statements fairly presented, he admitted during his deposition that he was *not* an expert on either of those rules, and stated that they were more in the domain of an auditing expert.  Ryan repeatedly stated that "I am not an auditing expert." (Edling Decl. Ex. 13, Ryan Dep. at 225:22-226:4; *see also id.* at 116:3-5; 226:5-10, 298:19-299:3.)  Indeed, when it was put to Ryan that SAS 69 confirms that technical compliance with GAAP does not assure fair presentation, Ryan retreated from his position and declared that he was not an expert about SAS 69.  He testified as follows:

15

Q.: Professor Ryan, SAS 69 specifically says that technical compliance with GAAP rules might not always lead to financial statements that are fairly presented and not misleading, right?

A.: I – Can you show me SAS 69?

Q.: Before I do that I just want to see what your understanding is unassisted by the actual rule.

A.: Again, *I am not an auditing expert* so the main area in SAS 69 that I am knowledgeable about is the [GAAP] hierarchy [*i.e.*, SAS 69 ¶ 5] and the application of the [GAAP] hierarchy.

Q.: When you say 'the main area' that you are knowledgeable about, are you suggesting that the *rest of SAS 69 you are not so knowledgeable about*?

A.: *I am not an auditing expert*. E&Y has two auditing experts. I am the GAAP accounting expert.

(*Id.* at 225:16-226:11.) Asked if "SAS 69 [is] binding on Ernst & Young as an auditor," Ryan explained that SAS 69 "is a statement of auditing standards." Since he admitted he was no "auditing expert," he therefore is not an expert on SAS 69, despite having relied on it for his disclosure opinion. (*Id.* at 227:2-16.)

Turning to Rule 203, which is the other rule Ryan cited in support of his personal view that compliance with SFAS rules leads to fair presentation of financial statements, Ryan repeatedly testified that this rule is also outside of his expertise. Specifically, he testified: "*I would say the application of Rule 203 is not within my professional expertise.*" (*Id.* at 229:18-230:5 (emphasis added).)

Indeed, when asked directly for the "specific authorities" that he can cite "for the proposition that compliance with FAS 140 or some other particular FAS rule by definition means that the financial statements are fairly presented and not misleading," Ryan did not profess to have expertise in this area. Rather, he responded merely with: "This is a place where I am *somewhat knowledgeable* about the *GAAS* accounting – the *GAAS* literature. . . ." (*Id.* at 189:14-

16

190:7 (emphasis added).)  Ryan put the topic of "fair presentation" in the category of "GAAS accounting," which as he testified several times during the deposition, was not something he is an expert on.

His lack of expertise became even more clear when Ryan was asked several questions about whether he had ever written any articles where he has taken the position that compliance with a particular FAS principle by definition means you have a fair presentation and the financial statements are not misleading.  In addition to saying "no," Ryan responded that this topic belonged to the realm of auditing, of which he was admittedly not an expert:

> Q:   What article or book that you have written can I look to to see where you say somewhere outside this conference room that if you comply with a particular FAS principle by definition you have a *fair presentation and statements that are not misleading*.  Where would I find that?
>
> A.:   Well, again, I am a GAAP accounting expert.  *My opinions about auditing, MD&A,  securities law are primarily as non expert.* . . .
>
> Q.   Leaving aside GAAP are you saying you are not an expert on disclosure requirements in 10-Ks and 10-Qs?
>
> A.   . . . . *I would not say that I am an expert about MD&A rules generally or other firm level SEC disclosure requirements*.
>
> Q.:   . . . . Can I find anywhere in your literature or your books a statement by you with regard to financial transactions when in sum or substance you say if you comply with the particular FAS rule on point that means you have fairly presented your financial statements and that they are not misleading?
>
> A.:   No.  Again, because my expertise is as a GAAP accounting expert, *not about issues that imply auditing or other firm level disclosure requirements*.
>
> Q.:   But regardless of the reasons why I can't, the answer is I can't find it in anything you wrote?
>
> A.:   Yes, *I don't write in that general area*, correct.

(*Id.* at 199:11-201:11 (emphasis added).)

Further highlighting Ryan's lack of expertise on areas relating to the adequacy of disclosure in financial statements, Ryan testified that he had "no familiarity" with SAS 32, which is entitled: "*Adequacy of Disclosure of Financial Statements*." He said he did not review it, or consider it in connection with his opining on the adequacy of Lehman's disclosures of Repo 105 in its financial statements. When asked about SAS 32, Ryan demurred, explaining that SAS 32 (like SAS 69 and Rule 203) is the "auditing expert's turf," noting again that he is "not an auditing expert." (*Id.* at 116:3-24.) If the rule that specifically deals with the "adequacy of disclosure of financial statements" is beyond the purview of Ryan's expertise, then he hardly can be allowed to give any testimony regarding the adequacy of Lehman's financial disclosures in this case. This testimony, thus, should be deemed inadmissible. *See SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) ("Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give.") (internal citations omitted).

To be sure, Ryan does claim to be an expert on FAS 140, as that, he says, falls within his "GAAP expertise." But, FAS 140 does not address disclosure of repos accounted for as "sales." In fact, Ryan acknowledged that there was an "absence of a specific disclosure requirement" in FAS 140 for such repurchase agreements. (Edling Decl. Ex. 13, Ryan Dep. at 218:4-15.) And, he agreed that FAS 140 would not give a company license to lie or make misleading statements in any event. (*Id.* at 209:11-16.)

That said, Ryan tried to argue that despite the "absence of a specific disclosure requirement" in FAS 140, the FASB was expressing its view through its silence that no disclosure was required. According to Ryan, FASB "would have known how to make a disclosure if it wanted a disclosure to be made." (*Id.* at 218:16-21.) Here again, Ryan stretches

his opinion beyond his expertise.  His expertise does not allow him to opine on the mindset of

FASB.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d. 531, 547 (S.D.N.Y. 2004)

("Inferences about the intent or motive of parties or others lie outside the bounds of expert

testimony."); *see also AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293

(D. Del. 2006) ("Expert witnesses are not permitted to testify . . . regarding [the defendant's]

intent, motive or state of mind, or evidence by which such state of mind may be inferred.").

Moreover, his argument that FASB's "silence" implies its view that "no disclosure is required"

to make the statements fairly presented is not expert testimony based on any statements found in

FAS 140; at best, it is argument for EY's counsel to make to the jury.

## III.    RYAN'S OPINIONS CONCERNING LEHMAN'S MISLEADING FOOTNOTE DISCLOSURES INVADE THE PROVINCE OF THE JURY

Ryan also sets forth various opinions in which he attempts to champion EY's argument

that Lehman's disclosures in Note 1 of its financial statements were not misleading.  For the

Court's reference, Note 1 of Lehman's footnote disclosures to its financial statements contained

a section stating as follows:

> Collateralized Lending Agreements and Financings
>
> Treated as collateralized agreements and financings for financial reporting purposes are
> the following:
>
> - Repurchase and resale agreements. . . .
>
> - Securities borrowed and securities loaned. . . .
>
> - Other secured borrowings. Other secured borrowings principally reflect transfers
>   accounted for as financings rather than sales under SFAS 140. . . .

(Edling Decl. Ex. 36, Lehman 2007 10-K, MDL Ex. 242, at 97; Edling Decl. Ex. 39, 2Q 2008

10-Q, MDL Ex. 18, at 16.)

In paragraphs 68 through 70, Ryan opines that the text of this 1 disclosure "simply does not imply that Lehman accounted for all of its repurchase agreements as secured borrowings." Turning to the "securitization activities" heading in Note 1, which is in the paragraph immediately above Lehman's misleading disclosure about its accounting of "repurchase agreements," Ryan states:  "I conclude that Lehman meant more than 'securitizations' when it used the term 'transfer of financial assets,' and that a reasonably knowledgeable user of financial reports would have understood this."  (Edling Decl. Ex. 4, Ryan Report ¶¶ 70, 71.)  These opinions cannot properly be given by this expert.

First, it is for the jury, not an expert, to determine what "Lehman meant" when it used the term "securitizations" in its footnote disclosures.  Likewise, it is for the jury to determine what "a reasonably knowledgeable investor of financial reports would have understood" this to mean.

Second, the jury does not need an expert to tell it whether the note disclosure regarding treating "repurchase agreements" as "financings," as a matter of plain English, does or "does not imply that Lehman accounted for <u>all</u> of its repurchase agreements as secured borrowings." Indeed, this Court was provided with the same information Ryan was with regard to this disclosure – the text of the note disclosure – and could not determine that the disclosure did not imply that "all" of Lehman's repurchase agreements were accounted for as secured borrowings. *See Lehman I*, 799 F. Supp. 2d at 282 ("At this stage, the Court cannot conclude as a matter of law that this disclosure sufficiently warned that an asset transferred pursuant to a repurchase agreement might be treated as a sale.").  Respectfully, if the Court cannot make this determination as a matter of law, then there is no way that Ryan can make that determination. The Court left the determination to the jury and Ryan purports to invade the province of the jury

with this opinion.  Thus, Ryan's opinion on what the note disclosures mean or what Lehman

meant by the disclosures should be precluded.

## IV.   RYAN'S OPINIONS BASED UPON MATERIALITY IMPROPERLY INVADE THE PROVINCE OF THE JURY AND SHOULD BE PRECLUDED

As noted above, expert testimony is only relevant if it "does not usurp either the role of

the trial court judge in instructing the jury as to the applicable law or the role of the jury in

applying that law to the facts before it."  *Snyder*, 2012 WL 4876938, at *2.  In spite of "whatever

expertise [an expert] may possess, no expert may supplant the role of counsel in making

argument at trial, and the role of the jury [in] interpreting evidence."  *Highland Cap. Mgmt., L.P.*

*v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (internal citations and quotations

omitted).

Courts regularly hold that an expert's "opinion on materiality is inadmissible and will be

excluded because it intrudes on the jury's role as fact finder and creates a serious danger of

confusing or misleading the jury into substituting the expert's assessment for the jury's own

assessment."  *Certain Underwriters at Lloyd's v. SSDD LLC*, No. 4:13-CV-1, 2014 WL

3097284, at *6 (E.D. Mo. July 7, 2014); *see also Tourre*, 950 F. Supp. 2d at 678 (holding that

expert opinion "on whether or not all 'economically material' information has been disclosed

improperly invades both the province of the judge to instruct on the law and the jury to find the

facts" -- that expert opinion as to "'economically material' information is based on 'economic

logic' is simply a form of inadmissible ipse dixit'  . . . because it is not based on reliable

methodology"); *Hill v. Equitable Bank*, No. 82-220, 1987 WL 8953 at *1 (D. Del. Mar. 3, 1987)

("The question of materiality depends in large part upon the reasonable man standard.

Determining what effect a particular fact would have upon the action of a reasonable man is, in

all areas of the law, an area of inquiry typically belonging to the finder of fact.").

Ryan offers opinions concerning materiality intrude on the role of the fact finder, and thus, they must be excluded.  Each of the following opinions must be precluded on that basis.

### A.     Ryan's Opinion that Lehman's Failure to Disclose Repo 105 Was Immaterial to Reasonable Investors Should Be Precluded

Ryan seeks to offer the opinion that "Lehman's use of sale accounting . . . did not mislead reasonable knowledgeable users . . . about Lehman's financial leverage in general or its disclosed net leverage ratio in particular, primarily because the securities involved were liquid."  (Edling Decl. Ex. 4, Ryan Report ¶ 17.)  Ryan surmises that reasonable investors would not find Repo 105 material because they were (allegedly) liquid, and thus, firms could have reduced their leverage in other ways, such as by selling the assets and using the proceeds to pay down debt. (*Id.*)  Indeed, Ryan goes so far as to opine that it "cannot be misleading not to disclose window dressing" provided it is done with "liquid assets."  (*Id.* ¶ 107.)  Relatedly, Ryan opines in at paragraphs 76 through 79 of his expert report, that "[t]here is nothing . . . misleading about Lehman's financial statements and associated notes related to Repo 105 transactions that would raise questions of materiality."  (*Id.* ¶¶ 76-79.)  These opinions are inadmissible and should be precluded.

Here, Ryan specifically invokes the concept of "materiality" to make his argument that there was no need for disclosure.  Essentially, he argues that reasonable investors would not care so no disclosure was necessary.  These are classic arguments concerning materiality that are to be left to the jury to decide.  In short, the issue of "materiality" and whether Lehman's use of Repo 105s would "mislead reasonably knowledgeable users" despite their alleged liquidity is ultimately for a jury to decide, not an expert.  *See SSDD LLC*, 2014 WL 3097284 at *6; *Tourre*, 950 F. Supp. 2d at 678; *Hill*, 1987 WL 8953 at *1.

Moreover, Ryan has no experience or expertise in determining what "reasonab[ly] knowledgeable" users of an investment bank's financials would or would not perceive to be material.  Ryan never worked outside of academia apart from a thirteen month "entry level" job he had approximately 30 years ago.  (Edling Decl. Ex. 13, Ryan Dep. 79:9-20.)  He never made presentations to any potential investors in his career (*id.* at 81:8-11), never met with credit agencies for the purposes of securing a better rating for a company (*id.* at 80:20-23), never prepared financial statements, never prepared 10-Ks or 10-Qs, and never was hired to provide advice as their preparation or the disclosures that should be made in them (*id.* at 77:20-79:23).  He has no background in investing or making investment decisions, never advised persons or companies on investment decisions, and does not even purport to have specialized knowledge of the investment banking industry, or of Lehman.  He is not a CPA, never practiced accounting, and has no auditing experience.  (*Id.* at 77:14-78:10.)  Indeed, Ryan admitted that Lehman was in a better position "to know the impact that Lehman's use of Repo 105 may have on credit rating agencies' opinions or investors' perceptions about Lehman."  (*Id.* at 81.)

As a result, even if Ryan could offer an opinion on materiality, he would lack the requisite experience, knowledge, and background to do so.  The jury does not need the assistance of Ryan, nor is he capable of providing it, on the issue of whether Lehman's use of Repo 105 misled "reasonably knowledgeable users."

### B.    Ryan's Opinions that Repo 105 was Immaterial and, Thus, Not Required to be Disclosed by APB 22 Should Be Precluded

Ryan also opines that the Lehman's (and EY's) failure to disclose Repo 105 in the "accounting principles" section of Lehman's public disclosures "complied with the requirements of APB 22" and also "complied with FAS 140."  (Edling Decl. Ex. 4, Ryan Report ¶¶ 17, 57,

62-63.)  This opinion also should be inadmissible because it turns on questions of materiality that should be left to the jury.

First, Ryan admitted at his deposition that APB 22 requires a company to disclose accounting principles that "materially" affect the financial statements, and that if Repo 105 transactions "materially affected Lehman's financial statements," "Lehman would have been required to disclose it under APB 22."  (Edling Decl. Ex. 13, Ryan Dep. at 157:4-160:4.)  Thus, his opinion that Lehman's disclosure "complied with APB 22" turns on his opinion that Repo 105 "did not materially affect Lehman's financial statements."  (*Id.* at 158.)  Because, for the reasons stated above, the issue of materiality belongs to the jury and the issue of disclosure under APB 22 turns on materiality, Ryan cannot opine that no disclosure was necessary under APB 22, as that would invade the province of the jury.  At best, he can opine that "hypothetically," if a jury were to find that Repo 105 had no material impact on the financial statements, than in that case no disclosure under APB 22 would be required.  Ryan's testimony goes far beyond that, however, when he opines *categorically* that Lehman's Note 1 "complied with" APB 22.

Second, Ryan's opinion that Lehman made the disclosure "required" by FAS 140 is not helpful to the jury because, as he admits, FAS 140 does not address the issue of disclosure.  Recognizing that there is an "absence of this specific disclosure" rule in FAS 140, Ryan argues that that the absence of a specific disclosure means that FASB intended that there be no disclosure.  Ryan's "view is that FAS 140 would have known how to say make a disclosure if it wanted a disclosure to be made."  (*Id.* at 218:4-15.)  EY's lawyers may perhaps be allowed to argue to the jury the hidden intent of FASB emanating from its silence on this disclosure issue, but, it is not for an expert to engage in speculation about another's true intent and motivations.

24

*See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d. at 547; *Torre*, 950 F. Supp. 2d at 681;

*AstraZeneca LP*, 444 F. Supp. 2d at 293.

## CONCLUSION

For the reasons stated above, Opt-Out Plaintiffs respectfully request that the Court

exclude Ryan's testimony in its entirety.

Dated: October 17, 2014

Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY, LLP**
Matthew K. Edling (medling@cpmlegal.com)
Bryan M. Payne (bpayne@cpmlegal.com)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Tel: (650) 697-6000

*Counsel for Plaintiffs Vallejo Sanitation & Flood
Control District, the Monterey County Investment
Pool (through Mary Zeeb, Monterey County
Treasurer), Contra Costa Water District, City of
Burbank, City of San Buenaventura, City of Auburn,
the San Mateo County Investment Pool, and Zenith
Insurance Company*

**MCDERMOTT WILL & EMERY LLP**
John J. Calandra (jcalandra@mwe.com)
Banks Brown (bbrown@mwe.com)
Michael Huttenlocher (mhuttenlocher@mwe.com)
Audrey Lu (aulu@mwe.com)
Allison E. Fleischer (afleischer@mwe.com)
340 Madison Avenue
New York, NY 10173
Tel: (212) 547-5400
Fax: (212) 547-5444

*Counsel for Plaintiffs Starr International USA Inv.
LC and C.V. Starr & Co., Inc. Trust*

*Merrill Davidoff* /AEF

**BERGER & MONTAGUE, P.C.**
Merrill G. Davidoff (mdavidoff@bm.net)
Lawrence Lederer (llederer@bm.net)
Robin Switzenbaum (rswitzenbaum@bm.net)
Gary Cantor (gcantor@bm.net)
Jon Lambiras (jlambiras@bm.net)
1622 Locust St.
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax (215) 875-4604

*Counsel for Plaintiff The State of New Jersey,
Department of Treasury, Division of Investment*

*Andrew Mytelka* /AEF

**GREER, HERZ & ADAMS, LLP**
Andrew Mytelka (amytelka@greerherz.com)
David LeBlanc (dleblanc@greerherz.com)
Jeanne Urbani Walser (jwalser@greerherz.com)
One Moody Plaza, 18th Floor
Galveston, Texas 77550
Tel: (409) 797-3200
Fax: (409) 766-6424

*Counsel for American National Insurance Company
and its subsidiaries and The Moody Foundation*

*Timothy Reuben* /AEF

**REUBEN RAUCHER & BLUM**
Timothy D. Reuben, *pro hac vice*
Stephen L. Raucher, *pro hac vice*
(sraucher@rrbattorneys.com)
Ashley J. Brick, *pro hac vice*
(abrick@rrbattorneys.com)
10940 Wilshire Blvd., 18th Floor
Los Angeles, CA 90024
Tel: (310) 777-1990
Fax: (310) 777-1989

*Counsel for Plaintiffs Retirement Housing
Foundation and Foundation Property Management,
Inc.*